# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JOSEPH CUSUMANO,**

                **Plaintiff,**

**-vs-**                                                         **Case No.  6:07-cv-141-Orl-22KRS**

**CONTINENTAL CASUALTY COMPANY,**
**a/k/a:  The Hartford Insurance Company,**

                **Defendant.**

_____

## ORDER

This cause comes before the Court on cross-motions for summary judgment by Plaintiff Joseph Cusumano and Defendant Continental Casualty Company (a.k.a. the Hartford Insurance Company) (Doc. Nos. 30 and 33), and oppositions by each to the other's motion for summary judgment (Doc. Nos. 35 and 36).  Additionally, Defendant moves to strike two exhibits attached to Plaintiff's Motion for Summary Judgment, on the basis that they are not part of the administrative record.  Doc. No. 34.  Plaintiff opposes the Motion to Strike (Doc. No. 38), and Defendant was granted leave to reply in support of the Motion to Strike (Doc. No. 43).  Based on the parties' submissions and a review of the administrative record and relevant case law, the Court denies the motion to strike but grants Defendant's motion for summary judgment.  Accordingly, Plaintiff's motion for summary judgment is denied.

**Issue**

The Court must conduct a de novo review to determine whether Defendant was "wrong" in finding that Plaintiff was not disabled under the terms of Defendant's long-term disability policy (*e.g.,* that he was not continuously unable to perform the material and substantial duties of his job that could not be altered or omitted.)  *See* Insurance Policy (AR 24, 33[1]); *Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1138 (11th Cir. 2004).  Plaintiff was employed as a Project Manager in the Information Technology Department of Société Génerále.  AR 74, 347-48, 1167.

**Introduction**

Plaintiff was employed at Société Génerále from 1997 to 2004.  AR 74.  Plaintiff's position as Project Manager required him to design and develop computer programs for the financial industry.  AR 347-48, 1167.  Plaintiff's duties included meeting with investment bankers and traders, designing and implementing programs, determining technical specifications, preparing written specifications for each project, meeting with programming teams, and taking quarterly trips to France to conduct meetings.  AR 1167.  Plaintiff worked between fifty and sixty hours per week.  AR 348.  Plaintiff participated in the Company's employee welfare benefit plan and was issued a long-term disability insurance policy.  AR 17-37.

In June 2002, Plaintiff injured his left foot while playing baseball.  AR 341, 1273.  In July 2002, Plaintiff underwent surgery on his left foot, for fractures and dislocation.  AR 609-

---

[1]References to "AR" are to the Administrative Record, which both parties filed with the Court. Doc. Nos. 31 and 33.

10.   In November 2002, Plaintiff underwent a second surgery, for hardware removal and ostectomy (bone removal).  AR 607-08.  Plaintiff underwent additional surgeries in February 2004 for fusion, bone graft, and implantation of a bone stimulator, and in December 2004 for hardware removal.  AR 591, 601, 604.  Plaintiff has also received multiple pain block injections.  AR 146, 546, 555-56.

In September 2003, Plaintiff began seeing Dr. Jan Slomba, Attending Physician of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center.  *See, e.g.*, Doc. No. 33-16 (Initial Visit Record).  Since then, Dr. Slomba has treated Plaintiff on a monthly basis through at least September 2007.  *See, e.g.,* AR 490-97, 544-56; Doc. No. 33-17 (Medical Records from Dr. Slomba since September 2005).   Plaintiff was diagnosed with reflex sympathetic dystrophy (RSD) and chronic regional pain syndrome Type II (CRPS).  *See, e.g.,* AR 555-56.  These afflictions cause pain and changes in tissue and bone.  Doc. No. 33 at p. 2. Plaintiff reported to Dr. Slomba crushing, freezing, and burning pain in his left foot as well as pain and numbness in his hands and feet.  *See, e.g.,* AR 492, 544, 547.  Dr. Slomba noted temperature differences between Plaintiff's feet and discoloration, swelling, and mobility issues in his left foot.  *See, e.g.,* AR 260-61, 492.

Since December 2004, Plaintiff has taken a variety of medications for pain and depression, including Oxycontin, Fentanyl, Cymbalta, Plendil, Baclofen, Desipramine, Senna-C, Xanax, Namenda, Clonidine, Alprazolam, and a variety of supplements.  AR 539, 1270, 1275.  Plaintiff ceased working on December 13, 2004,[2] and applied for long term disability

---

[2]Plaintiff's last day of work was December 10, 2004.  AR 77.

benefits.  AR 76-80.  In January 2005, Hartford requested a description of the restrictions on Plaintiff's physical activity from Dr. Parrish, a rheumatologist.[3]  AR 585-86.  In response to the request, Dr. Parrish wrote "the patient cannot weight bear for long or brief periods, cannot concentrate due to narcotics, cannot drive or use machinery, [and] cannot do cognitive intense work such as computers or writing with reliable in-depth analysis."  AR 585.

As part of the benefits determination, one of Defendant's employees interviewed Plaintiff by telephone in May 2005.  AR 146.  Plaintiff reported that he was only able to walk or stand for short periods before the pain became unbearable.  *Id.*  He could drive, he said, but he usually only went to the local pharmacy and spent most of his day watching television with his leg elevated.  *Id.*

In July 2005, Plaintiff saw Dr. Robert Dennis, an orthopaedic surgeon.  AR 1195.  Dr. Dennis reported that Plaintiff's "injury was extraordinarily severe[,]" and that Plaintiff had "severe residual reflex sympathetic dystrophy and [a] need for ongoing care[.]" AR 1216.  Dr. Dennis also wrote that Plaintiff would not get any better and that the best he could hope for was some improvement and an eventual return to some form of employment.  *Id.*

In August 2005, an investigator performed surveillance on Plaintiff and captured approximately thirteen minutes of footage on August 10, 2005 and approximately two minutes of footage on August 13, 2005.  AR 518.  Defendant provided the Court with the video.  Doc. No. 32.  On the August 10, 2005 video, Plaintiff is seen breaking down cardboard boxes, stacking them, kicking them, stomping on them, and moving them to the trash without difficulty

---

[3]Dr. Parrish had been treating Plaintiff since January 2004.  AR 592.

or any sign of pain.  *Id.*  He turns on and adjusts the sprinkler in his front lawn, squats down to

look at the sprinkler, and takes quick steps towards and away from it to avoid getting wet.  *Id.*

He ascends and descends the incline of his driveway and the eight stairs up to his front door.

*Id.*  On the August 13, 2005 video, Plaintiff gets into and out of his car without difficulty and

drives to the pharmacy and pizzeria.  *Id.*  Plaintiff appears to walk normally.  *Id.*

On September 15, 2005, the investigator visited Plaintiff's house and conducted an in-

person interview that lasted four and a half hours.  AR 457-59.  Plaintiff was lying on his bed

for most of the interview.  *Id.*  Though Plaintiff had taken his medications that morning, he was

able to concentrate, recall facts, and relate stories to the investigator during the interview.  *Id.*

During the interview, the investigator had Plaintiff execute a continuing disability

statement describing his limitations.  AR 1273-79.  Plaintiff stated that he could walk for five

minutes at a time at medium speed with a limp in his left foot.  AR 1275.  Plaintiff also stated

that he could stand for five minutes, but after five minutes, the pain set in.  *Id.*  Plaintiff reported

that he could walk up and down stairs with pain, and squat, also with pain, and that he had

difficulty getting into and out of his car.  AR 1275, 1277.  Plaintiff also stated that he sometimes

turned on his sprinkler but did not do other yard work himself.  AR 1277.  Plaintiff reported that

during the previous six months, he "had not been able to be more active or functional than what

he described in his statement."  AR 1278.

After obtaining this initial statement, the  investigator showed Plaintiff the surveillance

video, and Plaintiff executed a second statement.  AR 1271-72. Plaintiff acknowledged that the

activities on the video "exceeded the five minute limitation that [he] had reported earlier," but

according to Plaintiff, "[t]he amount of time was insignificant since I was moving cardboard

to the curb and moving the sprinklers.  I was able to do those activities on that day because it had to be done and there was no one else available to do it.  This is not an every day [sic] occurrence and it just took a few minutes . . . .  I probably spent the rest of the day resting in bed." AR 1272.  Plaintiff also stated that in the video, he could tell he had a slight limp and difficulty climbing the stairs.  AR 1271.  Plaintiff noted a thirteen-second gap in the video, and claimed that he could have been rubbing or resting his foot during those thirteen seconds.  *Id.*

On October 10, 2005, Dr. Slomba reported to Defendant that Plaintiff could "not perform sustained full work activities involving standing, walking for prolonged time or more than 1-2 hours attention or concentration due to pain related fatigue and side effects of medications affecting his alertness." AR 456.  Dr. Slomba had been provided with a copy of the in-person interview with Plaintiff and Plaintiff's statement regarding the video.  *Id.*  It is unclear whether Dr. Slomba had seen the surveillance video himself at that time.  *Id.*; Doc. No. 33 at p. 7 (Plaintiff claims that Dr. Slomba informed Defendant that Plaintiff could not work after reviewing the surveillance video); Doc. No. 30 at p. 10 (Defendant acknowledges that Defendant sent Dr. Slomba a copy of the surveillance video, but states that Dr. Slomba did not indicate that he had reviewed it).[4]

Plaintiff had also regularly been seeing Dr. Lans, a psychiatrist.  AR 473-488.  In October 2005, Dr. Lans reported that Plaintiff's principle limitation was slowness induced by

---

[4]The Court's decision here does not depend on whether Dr. Slomba had actually viewed the video at this time. This question of fact is not a material one that would preclude summary judgment. *See infra* p. 12-13 (discussing how application of the summary judgment standard does not fit Employee Retirement Income Security Act ("ERISA") cases).

opiates and that Plaintiff lacked significant cognitive impairment.  AR 422-23.  However, Dr. Lans would later change his mind.  *See infra* p. 8.

In October 2005, Defendant had independent consultants at the University Disability Consortium ("UDC") review Plaintiff's file.  Dr. Wagner, a physical medicine and rehabilitation specialist with UDC,  performed a medical record review.  AR 381-91.  Dr. Greenberg, a psychiatrist with UDC, performed a psychiatric medical record review.  AR 392-409.  Dr. Wagner summarized Plaintiff's treatment and complaints of pain and noted the foot surgeries, the surveillance video, and the interview.  AR 381-88.  Dr. Wagner attempted to consult with Dr. Slomba but was unsuccessful.[5]  AR 388.  Ultimately, Dr. Wagner concluded that Plaintiff's walking and standing should be limited, and that Plaintiff could not use his left foot for repetitive activities, but overall that he was functional at a sedentary level on a full-time basis.  AR 389, 391.  Dr. Wagner also stated that Dr. Slomba's assessments were largely subjective and based on Plaintiff's self reports rather than objective tests.  AR 389-90.  Dr. Greenberg summarized Dr. Lans' notes on Plaintiff's mental condition as well as Dr. Slomba's records on Plaintiff's physical condition.  Dr. Greenberg spoke to Dr. Lans, who told Dr. Greenberg that if Plaintiff "were free of opiates, he would have no restrictions or limitations at work."  AR 405.  Overall, Dr. Greenberg opined that "it is possible that the claimant is somewhat slowed at times by his drug use.  This is probably a valid observation by Dr. Lans and would be the only limitation present although it would not interfere with cognitive

---

[5]Dr. Slomba did not return the three telephone messages Dr. Wagner left over the course of three days. AR 388.

processes." AR 408.  Dr. Greenberg concluded that Plaintiff would require accommodations at work until he was detoxified.  AR 408-09.

Based on these reports, interviews with Plaintiff, Plaintiff's statements, medical records, and the video surveillance, Defendant's Maitland Claim Office (hereafter, the "Administrator") determined that Plaintiff did not "meet the policy definition of disability beyond November 30, 2005." AR 173-76.  Defendant sent Plaintiff a letter dated October 31, 2005, informing him that benefits would end on December 1, 2005.[6]  AR 173-76.

In February 2006, Dr. Lans completed a Mental Impairment Questionnaire provided by Defendant and reported that Plaintiff had marked functional limitations such as memory impairment, deficiencies in concentration, and restriction of daily living activities.  AR 1191-92.  This was contrary to Dr. Lans' prior report that Plaintiff lacked significant cognitive impairment.  AR 422-23.

Also in February 2006, Dr. Slomba reported that Plaintiff suffered from "confusion[,] memory loss, poor concentration, irritability" and crushing foot pain.  AR 1148.  At that time, Dr. Slomba also stated that Plaintiff was incapable of even low stress jobs because his pain was too severe, that he could walk zero city blocks without rest or severe pain, that he could sit and stand or walk for less than two hours total in an eight-hour working day, that he could only occasionally look down or turn his head, that he could never hold his head in a static position, that he had significant limitations with reaching, handling, and fingering, and that he needed

---

[6]Defendant had initially approved long-term disability benefits for Plaintiff until December 10, 2005.  AR 178.

to lay down most of the day.  AR 1148-51.  Dr. Slomba's opinion of Plaintiff's abilities would later change.  *See infra* pp. 9, 16-17.

Plaintiff appealed Defendant's denial of benefits in April 2006.  AR 324.  In support of Plaintiff's appeal, Plaintiff submitted the February 2006 report from Dr. Slomba, stating that Plaintiff was permanently unable to work (AR 1149-51), a report from Dr. Lans stating that Plaintiff had "marked" limitations on daily living activities (AR 1190-93), and the July 2005 evaluation by Dr. Dennis, who had examined Plaintiff and found that Plaintiff was "certainly not going to get any better than he is now." AR 1216.

Plaintiff was awarded social security benefits due to his disability on May 10, 2006 (AR 272-78), and informed Defendant of the Social Security Administration's award on June 1, 2006 (AR 268).

During the appeal, Defendant requested a functional capacity examination (FCE) to determine if Plaintiff was cognitively impaired.  AR 167-68, 316.  Plaintiff refused to undergo the examination.  AR 268-69.  Plaintiff's attorney sent Defendant a letter asserting that the Employee Retirement Income Security Act ("ERISA") did not entitle Defendant to conduct further investigation, because Plaintiff argued it would deprive him of the chance to address the results of that examination.  *Id.*

As part of the appeal, Defendant had independent consultants at Reed Review Services ("RRS") analyze Plaintiff's file.  AR 256-63.  Dr. Goldman, a psychiatrist with RRS, and Dr. Marion, a pain management specialist with RRS, reviewed the file and spoke with Dr. Lans and Dr. Slomba.  AR 162, 259, 261-62.  Dr. Slomba told Dr. Marion on June 12, 2006, that after seeing the surveillance video, he believed Plaintiff to be "capable of performing sedentary

work." AR 261-62.  This was directly contrary to Dr. Slomba's opinion in February 2006 that Plaintiff was "incapable of even 'low-stress' jobs."  AR 1148-51.

Dr. Goldman of RRS reported that he spoke to Dr. Lans and that Dr. Lans stated that Plaintiff was addicted to painkillers and that his activities of daily living were intact.  AR 259. Dr. Goldman concluded that Plaintiff had a "well documented history of left foot surgeries" but that "[t]his objective impairment" only supported limiting Plaintiff to "sedentary duty or light duty with occasional ambulation."  AR 262.

Based on Dr. Marion and Dr. Goldman's review, in June 2006, Defendant's Atlanta Appeal Unit found the Administrator's initial denial of benefits to be correct.  AR 160-64. Defendant informed Plaintiff of this decision on June 19, 2006.  *Id.*  Plaintiff filed this lawsuit under ERISA on January 29, 2007 (Doc. No. 1), and amended the Complaint on March 20, 2007 (Doc. No. 14).

## Analysis

### I. The Policy

The insurance policy at issue in this case gives the insurer (through an Administrator) discretion in deciding whether to approve or deny benefits.  *See* AR 22 ("When making a benefit determination under the policy, We have discretionary authority to determine Your Eligibility for benefits and to Interpret the terms and provisions of the policy.").

Under the terms of the policy, benefits will be awarded to those who suffer a disability, defined as "Injury or Sickness [that] causes physical or mental impairment to such a degree of severity that You are . . . continuously unable to perform the Material and Substantial Duties of Your Regular Occupation [.]"  AR 24.  Plaintiff's "Regular Occupation" is defined as the

"occupation that You are performing for income or wages on Your date of disability" and "is not limited to the specific position You held with Your employer." AR 33. The "Material and Substantial Duties" are the "necessary functions of Your Regular Occupation which cannot be reasonably omitted or altered." AR 33.

The policy also states that the claimant must submit "proof of disability" to avoid delay, suspension, or termination of benefits. AR 29. "Proof of disability" consists of, among other items, the cause of the disability, the prognosis of the disability, proof of receiving appropriate and regular care for the condition from a doctor, and objective medical findings which support the disability. AR 29-30. The policy requires claimants to submit continuing proof of disability and submit to a physical examination. AR 30. Specifically, the policy states, "[a]t Our expense, We have the right to have a doctor examine You as often as reasonably necessary while the claim continues. Failure to comply with this examination will suspend or terminate benefits[.]" *Id.*

## II. Summary Judgment and ERISA Standards of Review

The text of ERISA itself does not set forth a standard for district courts to apply in reviewing an administrator's denial of benefits. However, the Supreme Court has held that in a case where the insurance policy vests the administrator with discretion in making benefits determinations, the district court should review the determination under a deferential arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Supreme Court also held that where the administrator has discretion but is operating under a conflict of interest, a somewhat less deferential standard applies. *Id.*

To apply the Supreme Court's holding in *Firestone*, the Eleventh Circuit has outlined

a six-step test that a district court must follow whenever it reviews an administrator's decision:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Doyle v. Liberty Life Assurance Co. of Boston*, 511 F.3d 1336, 1340 (11th Cir. 2008) (citing

*Williams v. BellSouth Telecomms., Inc.,* 373 F.3d 1132, 1138 (11th Cir. 2004)).  Thus, in all

ERISA cases, the district court must first assess de novo whether the administrator's decision

was wrong under the policy.  De novo review in every case seems contrary to the Supreme

Court's holding that some deference is to be afforded the Administrator, even if he acts under

a conflict of interest.  *See Firestone,* 489 U.S. at 115.  Still, the Court must apply the Eleventh

Circuit's six-step approach set forth in *Williams,* 373 F.3d at 1138, and recently reiterated in *Doyle,* 511 F.3d at 1340.[7]

Though this case comes before the Court on cross-motions for summary judgment, the summary judgment standard set forth in Fed. R. Civ. P. 56 is incongruent with the ERISA standard of review. *Compare* Fed. R. Civ. P. 56(c) *and Williams,* 373 F.3d at 1138; *see also Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir. 2002). The Eleventh Circuit charges the district court with determining de novo whether the Administrator's decision was wrong (*Williams*, 373 F.3d at 1138), rather than whether there are questions of material fact that require trial and whether the parties are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). There may indeed be unresolved factual issues evident in the administrative record, but unless the Administrator's decision was wrong, these issues will not preclude summary judgment as they normally would. *See Leahy*, 315 F.3d at 17; *see also* this Court's decision in *Crume v. Metropolitan Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272-73 (M.D. Fla. 2006) (in-depth

---

[7]The standard for reviewing ERISA claims may change soon. The Eleventh Circuit panel in *Doyle* criticized the six-step test as contrary to *Firestone* and as presenting the Administrator with the insurmountable burden of proving (in step 6) that the administrator's decision was not tainted by conflict. *Doyle*, 511 F.3d at 1344-45. The Eleventh Circuit called it a "troublesome" and "unworkable standard" and urged the Eleventh Circuit Court to review it en banc. *Id*. at 1346-47. In light of this opinion, the defendant in *Doyle* filed a petition for rehearing en banc on January 28, 2008. *Doyle v. Liberty Life Assurance Co.*, Docket No. 07-10348-EE. The Eleventh Circuit stayed its ruling on whether to rehear the case en banc until the Supreme Court rules in *Metro. Life Ins. Co. v. Glenn* (Supreme Court Docket No. 06-923). The Supreme Court granted certiorari in *Glenn* on January 18, 2008 to address two questions: (1) whether the fact that a claim administrator funds the benefits to be paid, without more, is sufficient to constitute a conflict of interest which must be weighed in reviewing the decision under *Firestone,* 489 U.S. at 115; and (2) whether an administrator must consider and refute a decision of the Social Security Administration's administrative law judge, when the administrator does not have the underlying record. *See* www.supremecourtus.gov/ docket/06-923.htm. Oral arguments in *Glenn* are set for April 23, 2008. *Id.*

discussion of interplay between ERISA and summary judgment standards as applied by courts in the Middle District of Florida and elsewhere).

Here, the Court has reviewed de novo the administrative record, the parties' briefs, Plaintiff's additional exhibits,[8] and the surveillance video.  Based on these submissions, the Court holds that the Administrator was not wrong in determining that Plaintiff was not "impair[ed] to such a degree of severity that [he was] continuously unable to perform" the "necessary functions of his regular occupation which [could] not be reasonably omitted or altered."  AR 24, 33; *see also Doyle*, 511 F.3d at 1340.  Thus, the Administrator's decision is affirmed, and Defendant is entitled to summary judgment.

### III.  The Surveillance Video and Plaintiff's Medical Records

Plaintiff alleges that his foot injury and surgeries left him with crushing, freezing, burning, and throbbing pain in his left foot.  *See, e.g.,* AR 492, 544, 547.  Plaintiff's pain is difficult to assess objectively.  At each office visit, Dr. Slomba would ask Plaintiff to rate his pain on a scale of one to ten, examine his feet, and prescribe medication.  *See, e.g.,* AR 490-97.  Plaintiff argues that his subjective complaints of pain and impaired functionality are "objectified evidence of disability" "as recorded by his doctors."  Doc. No. 33 at p. 18.  However, Plaintiff's subjective complaints do not become objective simply because a doctor wrote them down.

Video footage totaling about fifteen minutes over two days provides some objective evidence.  *See* AR 457; Doc. No. 32.  In the video, Plaintiff stomps on and kicks cardboard boxes with both feet, takes three quick steps toward and away from the sprinkler to adjust its

---

[8]The Court denies Defendant's Motion to Strike Plaintiff's Extra-Record Exhibits (Doc. No. 34). *See infra* pp. 22-23.

-14-

position, repeatedly climbs up and down his front stairs without difficulty,[9] ascends and descends the incline of his driveway (even while carrying numerous broken down cardboard boxes), steps on and off the curb, and gets into and out of his car, all without apparent difficulty or pain. Doc. No. 32. In a case where a great deal of the evidence is based on subjective reports of pain by the Plaintiff, the video surveillance provides objective evidence of Plaintiff's capabilities on those days. The Administrator was correct in relying on the footage in assessing Plaintiff's subjective reports. *See Schindler v. Metro. Life Ins. Co.*, 141 F. Supp. 2d 1073, 1081 (M.D. Fla. 2001); *Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1274 (11th Cir. 2002).

Plaintiff had stated before the surveillance video was taken that on a good day, he visited the pharmacy and pizzeria and turned the sprinkler on himself. AR 1274-78. Plaintiff is seen performing these activities on the video, consistent with his prior statement. However, in the video, Plaintiff also repeatedly stomps on and breaks down cardboard and otherwise uses both feet with no difficulty. Plaintiff had stated that he had difficulty getting into and out of the car because of his left foot (AR 1277), but on the video, Plaintiff did this easily, even while holding a pizza box. Additionally, Plaintiff had stated that he could only stand for five minutes before the pain became unbearable (AR 146, 1275), but he was videotaped standing for longer than that without any visible signs of pain. Plaintiff's level of activity in the video was inconsistent with his stated condition.

---

[9]Plaintiff climbed the stairs at a faster pace on August 10, 2005, than on August 13, 2005. Still, Plaintiff did not appear to have substantial difficulty ascending or descending the stairs on either day.

Plaintiff recognized these discrepancies and explained in a continuing disability statement executed in front of the investigator that Plaintiff was "able to do those activities on that day because it had to be done and there was no one else available to do it." AR 1272. "This is not an every day [sic] occurrence," he continued, "and it just took a few minutes . . . . I probably spent the rest of the day resting in bed." *Id.* However, Plaintiff's explanation fails to satisfactorily explain the discrepancy between what he said he could do and what he was seen doing in the video.

The video footage also runs counter to Plaintiff's medical records. Dr. Slomba concluded in February 2006 that Plaintiff was not capable of even low-stress jobs, because he could not walk a city block, could only look down or turn his head occasionally, could never hold his head in a static position, and had trouble reaching and handling things. AR 1148-51. However, these limitations are contradicted by the surveillance video.

Plaintiff argues that Dr. Slomba, Dr. Parrish, and Dr. Lans each advised Defendant that Plaintiff was unable to work and that these opinions should prevail.[10] Doc. No. 33 at p. 19. Dr. Slomba had been treating Plaintiff on a monthly basis since 2003, and reported that Plaintiff was unable to work in October 2005. AR 456; Doc. No. 33-16. However, during the benefits denial appeal in June 2006, Dr. Slomba told Dr. Marion that after seeing the video, Dr. Slomba "agreed that [Plaintiff] is functionally capable of working at the sedentary occupational level." AR 162,

---

[10]Plaintiff also stresses that the Social Security Administration's administrative law judge ("ALJ") found Plaintiff to be completely disabled. AR 272-78. However, Plaintiff admits that the ALJ's ruling is not determinative under the insurance policy (AR 268), nor is it binding on the court. *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n. 32 (11th Cir. 1994). Additionally, the ALJ did not view the surveillance video. Doc. No. 35 at p. 19.

261-62.  Dr. Slomba changed his mind regarding Plaintiff's disability, and Plaintiff failed to refute this with any statement from Dr. Slomba about this conversation with Dr. Marion.[11]

Plaintiff faults Defendant for not confirming Dr. Slomba's change of heart (Doc. No. 36 at pp. 3, 6), but Plaintiff bears the burden of showing that he is entitled to benefits.  AR 29-30; *see also Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004) (citations omitted).  The Court has no reason to doubt Dr. Marion's report that Dr. Slomba changed his mind upon seeing the video and considered Plaintiff to be capable of sedentary work.[12]

Plaintiff also cites Dr. Lans' February 2006 determination that Plaintiff was severely impaired and unable to work (AR 1192), but Dr. Lans had stated in October 2005 that Plaintiff's "principle limitation was slowness induced by opiates, and that Plaintiff lacked significant cognitive impairment or depression."  AR 422-23.  Defendant was not wrong in crediting other evidence over Dr. Lans' inconsistent opinion.  Plaintiff points out that in January 2005, Dr. Parrish had stated that Plaintiff "cannot *weight bear* for long or *brief periods*, cannot concentrate due to narcotics, *cannot drive* or use machinery, cannot do cognitive intense work such as

---

[11]Plaintiff did provide additional medical records from Dr. Slomba after Dr. Marion's review and conversation with Dr. Slomba.  Dr. Marion reported that he spoke to Dr. Slomba on June 12, 2006.  AR 261-62.  Plaintiff saw Dr. Slomba on June 15, 2006, but Dr. Slomba made no mention of his conversation with Dr. Marion in his notes from that visit.  Instead, Dr. Slomba noted that "since the last visit in May 2006, the patient reported the left foot pain is *under better control* but neck pain continues to worsen . . . [Plaintiff] presented today with 6/10 pain in the left foot."  Doc. No. 33-17 (Dr. Slomba Medical Records Subsequent to September 2005) (emphasis added).  Dr. Slomba's notes after the conversation with Dr. Marion indicate that Plaintiff's left foot was improving, which is consistent with Dr. Marion's report that Dr. Slomba now believed Plaintiff was capable of sedentary work.

[12]Even if the Court did not believe Dr. Marion, the video itself undermines Dr. Slomba's prior description of Plaintiff's abilities.

computers or writing with reliable in-depth analysis." AR 585 (emphasis added).  However, Dr. Parrish's opinion that Plaintiff could not drive or weight bear for even short periods was also contradicted by the surveillance video.  *See id.*

Furthermore, Defendant is not required to afford any special weight to a treating physician's opinion.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.")  Defendant is also permitted to rely on the opinions of paid independent reviewers.  *Hufford*, 322 F. Supp. 2d at 1359 (citations omitted).  Though Plaintiff argues that "University Disability Consortium and Reed Review Services are regularly retained by [Defendant] and profit greatly from having [Defendant] as a client, as does . . . the surveillance team," (Doc. No. 33 at p. 24), the fact that these individuals are paid, without more, does not invalidate their observations.

In denying benefits, Defendant did not deny that Plaintiff has foot problems.  Dr. Marion, who reviewed the administrative record during Defendant's internal appeals process, stated that Plaintiff "has a well documented history of left foot surgeries" and that "[t]his objective impairment supports the permanent restriction of sedentary duty or light duty with occasional ambulation." AR 262.  Defendant determined that Plaintiff's condition did not meet the policy definition of disabled (*e.g.,* being continuously unable to perform the material and substantial duties of his job).  Doc. No. 30 at pp. 17-18; AR 24.  The policy defines "material and substantial duties" as the "necessary functions of Plaintiff's Regular Occupation which cannot

be reasonably omitted or altered." AR 33.  Thus, even though Plaintiff's condition would have required altering his duties, the Administrator determined that Plaintiff was still able to perform the material and substantial duties of his job.  While Defendant may have had to provide Plaintiff with an adjusted schedule and an alternative to traveling to Paris (AR 1167), Plaintiff was still able to perform the material and substantial duties of a project manager with reasonable alterations.

In light of the policy, video footage, reviewers' opinions, and inconsistent opinions offered by Dr. Lans and Dr. Slomba, the Court holds that the Administrator's decision to deny benefits was not "wrong."  *Williams*, 373 F.3d at 1138.

## IV.  Plaintiff's Cognitive Abilities

Plaintiff claims that his cognitive abilities are too impaired by medication for him to perform the duties of his job.  AR 1276.  Plaintiff's brief states that Defendant "fails to address how a man who, *e.g.,* cannot even follow the story line in a novel, and cannot maintain sustained attention or concentration, is not alert, and is irritable and depressed, is [sic] capable of remember[ing] complex formulas, designing computer programs, providing accurate and complex analysis and advice in the international banking arena, and mak[ing] complicated decisions[,]" nor how such a man could conduct meetings or work fifty to sixty hours per week.  Doc. No. 33 at p. 20 n. 21.  Plaintiff's assertion now that his disability is based on a cognitive impairment is inconsistent with a letter Plaintiff's counsel sent Defendant during the appeal, which stated that the basis of the disability claim was "physical in nature," "not mental/nervous"

and that any mental impairments are the "result of the pain Plaintiff experienced twenty four hours per day, seven days per week."[13]  AR 338-39.

Despite this inconsistency, the Court considers the potential cognitive disability and finds that support for it is also subjective.  Plaintiff reported to the investigator in September 2005 that his mental function had deteriorated because he was taking more pain medication.  AR 464-65. Plaintiff does take large amounts of narcotics (AR 539, 1270, 1275), and Dr. Parrish indicated that Plaintiff had difficulty concentrating due to these drugs and could not do cognitively intense work (AR 585).  However, there is evidence indicating that Plaintiff is cognitively able to perform the "substantial duties of his job." AR 24.  Both Dr. Lans and Dr. Greenberg indicated that Plaintiff's only problem was drug dependence.  AR 408-09, 422-23.  While Dr. Lans' opinion proved to be inconsistent, Dr. Greenberg agreed with Dr. Lans that Plaintiff lacked cognitive impairment, based on a review of Dr. Lans' notes and a discussion about Plaintiff's case with him.  AR 405-09.  Dr. Greenberg's review of the file specifically concluded that Dr. Lans' "plan for detoxification [was] appropriate and should result in no limitations whatever induced by drug use[.]" AR 409.  Defendant's investigator also reported that Plaintiff was lucid, had a good memory, and could remember and tell stories during the four and a half hour interview at Plaintiff's home.  AR 459.  Based on this evidence, the Court holds that Defendant was not "wrong" in finding that Plaintiff lacked cognitive impairments that would render him disabled under the insurance policy.  *See Williams*, 373 F.3d at 1128.

---

[13]This description of Plaintiff's condition seems overstated in light of the video surveillance. *See* Doc. No. 32.

**V. Additional Examination Requested by Defendant**

Defendant attempted to further investigate whether Plaintiff's drugs caused a cognitive disability, but Plaintiff refused Defendant's request for a cognitive functional capacity examination (FCE) after the denial of benefits.  *See, e.g.*, AR 161-64, 268-70, 304-06, 316. Plaintiff refused to undergo any additional examination, claiming that if Defendant needed the additional information to review the benefits decision, it was clear that Defendant lacked sufficient information to deny him benefits in the first place.[14]  AR 304-06.  Defendant argues that pursuant to the policy, it had the right to request a medical examination at any time.  AR 161-62; Doc. No. 30 at pp. 23-24.  Regardless, Defendant does not claim that it terminated benefits because Plaintiff refused to submit to the examination, even though Defendant now argues that the policy language would require denial on that basis.  Instead, Defendant went ahead and conducted its review on appeal without the additional FCE and decided that the Administrator's denial was correct.  AR 163.  The Court need not determine whether Plaintiff had the right to refuse to submit to the examination,[15] because Defendant did not deny Plaintiff's claim on the basis of his refusal.  *See id.*

---

[14]The Court notes that preventing an insurer from obtaining additional examinations on appeal would have the perverse effect of limiting information available to the insurer on appeal.  Rather than limiting the insurer to incomplete information, in some cases it may be appropriate to conduct an additional examination during an appeal of the denial of benefits.

[15]The policy language indicates that Defendant can order an independent medical examination at any time "while the claim continues."  AR 30.  The phrase "while the claim continues" seems to indicate that an exam may be ordered at any time while the beneficiary is pursuing the claim. However, failure to submit to the exam may cause Defendant to "suspend or terminate benefits."  *Id.* As Plaintiff points out, at the time of the appeal, benefits had already been terminated.  AR 173-76. The threat of suspension or termination of benefits has no teeth in this case.  Thus, each party has a textual argument to support its policy interpretation.

## VI.  Plaintiff's Job Description

Plaintiff also contends that Defendant neglected to obtain Plaintiff's job description from the former employer or dictionary of occupational titles or any other source and that this failure means that Defendant's determination that Plaintiff's job was "sedentary with occasional walking and that the position allows for postural flexibility" (AR 163) was incorrect.  Using that unverified description, Plaintiff argues, makes Defendant's benefits denial arbitrary and capricious.  Doc. No. 33 at p. 20.  First, the Court notes that it must first determine whether the denial was wrong, not whether the decision was arbitrary and capricious. *Williams*, 373 F.3d at 1138.  Furthermore, Defendant spoke to Plaintiff's supervisor about Plaintiff's job duties.  AR 143.  Even using the job description supplied by the Plaintiff,[16] the Court finds on de novo review that the Administrator's determination that Plaintiff was not continuously unable to perform the material and substantial duties of his job was correct.

## VII.  Defendant's Motion to Strike

The Eleventh Circuit mandates reviewing de novo the Administrator's benefits-denial decision (*Doyle*, 511 F.3d at 1336), and in this de novo review, the Court is not limited to the administrative record.[17]  *See Sanzone v. Hartford Life & Accident Ins. Co.,* 519 F. Supp. 2d

---

[16]Plaintiff's motion for summary judgment states that Plaintiff's duties included meeting with investment bankers and traders, designing and implementing programs, determining technical specifications, preparing written specifications for each project, meeting with programming teams, and quarterly visits to France to conduct presentations and meetings.  Doc. No. 33 at p. 2 (citing AR 1167).

[17]The Court's decision to grant Defendant's motion for summary judgment would be the same even if it was not permitted to consider the extra-record exhibits attached to Plaintiff's motion for summary judgment (Doc. Nos. 33-16 and 33-17).

1250, 1252-54 (S.D. Fla. 2007)[18]; *see also Williams v. Greater Georgia Life Ins. Co.*, No. 1:06cv387-CSC, 2007 U.S. Dist. LEXIS 2429, at * 18 (M.D. Ala. Jan. 11, 2007) (hereafter, "*Greater Georgia*").

The Supreme Court has held that in a case where the administrator has discretion, the arbitrary and capricious standard applies (*Firestone,* 489 U.S. at 115), and in these cases, the Eleventh Circuit has limited review to what is contained in the administrative record (*see, e.g., Kinser v. Plans Administration Commission of Citigroup, Inc*., 488 F. Supp. 2d 1369, 1376 (M.D. Ga. 2007) (citing *Jett v. Blue Cross & Blue Shield of Alabama, Inc*., 890 F.2d 1137, 1139 (11th Cir. 1989)).  The Supreme Court has also held that in cases where the administrator acts with discretion but operates under a conflict of interest, Courts are to give less deference to the decision (*Firestone,* 489 U.S. at 115), and in those cases, the Eleventh Circuit has also limited review to the administrative record (*see Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir. 2001)).  However, these Eleventh Circuit cases limiting review to the record are not determinative, because the Eleventh Circuit has also required the district court to conduct a de novo review in all ERISA cases.  *Williams*, 373 F.3d at 1138; *see also Brown v. Blue Cross & Blue Shield, Inc.*, 898 F.2d 1556, 1566 n.12 (11th Cir. 1990).

---

[18]In *Sanzone*, 519 F. Supp. 2d at 1252-54, the district court stated that the Eleventh Circuit has not yet opined upon when supplementation of the record would be permissible under the arbitrary and capricious standard but is "among the more liberal courts in permitting supplementation of the record on de novo review."

In a de novo review, the court must not be limited to evidence already in the record. *See Moon v. Am. Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989).[19] To limit the inquiry to the administrative record would not provide meaningful de novo review. *Greater Georgia*, 2007 U.S. Dist. LEXIS 2429, at * 18 (citations omitted). Furthermore, to have the district court determine whether the administrator was "wrong" given only limited facts would provide even less protection to beneficiaries under ERISA than the law would without ERISA. *Moon,* 888 F.2d at 89. Because the first step of the Eleventh Circuit test is truly de novo,[20] the Court here considers evidence not in the administrative record. Thus, Defendant's Motion to Strike is denied.

---

[19]In *Moon*, 888 F.2d at 89, the Eleventh Circuit allowed consideration of information outside the administrative record, but unlike the case at hand, the administrator in *Moon* did not have discretion under the policy.

[20]The discretion afforded the administrator factors into the test in step three, where "if the administrator's decision is 'de novo wrong' and he was vested with discretion[,]" then the Court must "determine whether reasonable grounds supported it . . . ." *Williams*, 373 F.3d at 1138. At that point, the Court may consider what was reasonable given the information contained in the record, knowing that the administrator did not have the additional information available.

**Conclusion**

Based on the foregoing, it is ORDERED as follows:

1.  Defendant's Motion to Strike (Doc. No. 34), filed December 17, 2007, is DENIED.

2.  Defendant's Motion for Summary Judgment (Doc. No. 30), filed November 16, 2007, is GRANTED.

3.  Plaintiff's Motion for Summary Judgment (Doc. No. 33), filed November 16, 2007, is DENIED.

4.  The Clerk shall enter a final judgment providing that the Plaintiff, Joseph Cusumano, shall take nothing on his claims against the Defendant, Continental Casualty Company (a.k.a. The Hartford Insurance Company).  The judgment shall further provide that the Defendant shall recover its costs of action.

5.  Any other pending motions are denied as MOOT.

6.  The Clerk is directed to CLOSE the file.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on April 9, 2008.

Copies furnished to:
Counsel of Record

ANNE C. CONWAY
United States District Judge